UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY HAWKINS,

        Plaintiff,

v.                                                                      Case No. 08-13874

                                                                        Paul D. Borman
                                                                        United States District Judge

GENESYS HEALTH SYSTEMS,
CENTER FOR GERONTOLOGY, GENESYS
AMBULATORY HEALTH SERVICES, INC.,
GENESYS HOME HEALTH & HOSPICE, INC.,
ELDER ABUSE AND EXPLOITATION PREVENTION,
and ASCENSION HEALTH,

        Defendants.
_____/

OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

        Before the Court is Defendants' Motion to Dismiss and/or For Summary Judgment (Dkt. No.

23). Plaintiff filed a Response (Dkt. No. 25) and Defendants filed a Reply (Dkt. No. 26). A hearing

was held on March 11, 2010. For the reasons that follow, the Court DENIES Defendants' Motion

to Dismiss and/or For Summary Judgment as to Counts I and II and GRANTS Defendants' Motion

as to Counts III and IV.

I.      INTRODUCTION AND BACKGROUND

        Plaintiff claims that Defendants wrongfully terminated her employment because they

perceived her as having a disability after she suffered a broken leg, which was precipitated by her

underlying condition of rheumatoid arthritis, and wrongfully refused to accommodate her need to

walk with a cane or a crutch. Defendants respond that Plaintiff acknowledged in her acceptance of

employment that she was a probationary employee for 1,040 hours, a condition Defendants claim had not been met when Plaintiff suffered her broken leg. Defendants assert that as a probationary employee, missing 14 consecutive days of work was an act of voluntary quit and therefore Defendants properly terminated Plaintiff when she did not come to work for 14 consecutive days as a result of her broken leg.

### A. Plaintiff's Employment History

Plaintiff began working for Defendant Genesys Health and Hospice ("GHHH") as a social worker in 1996. (Defs.'s Mot. Ex. 1, Hawkins Dep. 94, July 8, 2009.) Her job with GHHH involved in-home psychosocial assessments, patient counseling and educational in-services. (Defs.'s Mot. Ex. 1, Hawkins Dep. 95-96.) During the last three years of her employment with GHHH, Plaintiff also performed guardian reviews, geriatric assessments and ran a caregiver support group for Defendant Center for Gerontology ("CFG"). (Defs.'s Mot. Ex. 1, Hawkins Dep. 95-96.) Although performing services for CFG, Plaintiff continued to receive paychecks only from GHHH and her supervisor throughout her tenure with GHHH was Carol Osborne, a GHHH employee who reported to the President of GHHH. (Defs.'s Mot. Ex. 1, Hawkins Dep. 94, 96-97.) When performing geriatric assessments for CFG, Plaintiff worked with CFG employee Diane Nims and also assisted Ms. Nims with preparation of guardian reviews on a monthly basis. (Defs.'s Mot. Ex. 1, Hawkins Dep. 97-99; Ex. 3, Nims Dep., September 10, 2009, 24, 32.)

In October, 2007, Ms. Nims approached Plaintiff to inquire if she would be interested in working with a new program, the Elder Abuse and Exploitation Program ("EAP"). (Defs.'s Mot. Ex. 1, Hawkins Dep. 70.) Ms. Nims was to serve as director of the EAP, which was to be run by CFG, funded by a grant from Genessee County. (Defs.'s Mot. Ex. 1, Hawkins Dep. 105-106, 169.)

Plaintiff testified that Ms. Nims approached her because they had been working together for several years. Plaintiff applied for the position on October 7, 2007, a date she remembers well because she fell that day when leaving a patient's home and broke her left femur. (Defs.'s Mot. Ex. 1, Hawkins Dep. 70, 122-23; Pl.'s Resp. Ex. C (Application).) Plaintiff was selected for the position.

Accordingly, on December 31, 2007, Plaintiff resigned her position with GHHH. (Defs.'s Mot. Ex. 1, Hawkins Dep. 40-41; Ex. 4, 12/31/04 Letter of Resignation.) On January 3, 2008, Plaintiff accepted the new position with CFG and was to report to work for orientation on January 7, 2008. (Defs.'s Mot. Ex. 5, Acceptance of Employment.) The Acceptance of Employment with EAP, which Plaintiff signed, indicates that her employment status was subject to termination at any time for any reason, by either Plaintiff or CFG, and that Plaintiff would be in a probationary period for 1040 hours. (Defs.'s Mot. Ex. 5.) Plaintiff testified that she knew that she was considered probationary when she hired on with CFG. (Defs.'s Mot. Ex. 1, Hawkins Dep. 186.) She strongly objected, however, to the fact that, despite her 12 years with the GHS she was considered a new employee upon her transfer to CFG and lost both seniority and certain benefits. (Defs.'s Mot. Ex. 13.) Plaintiff's counsel stated at the hearing in this matter that although Plaintiff signed all of the paperwork acknowledging the conditions of the transfer, GHS did not consistently treat her as a new employee. For example, they did not discontinue her health care and on February 19, 2008, Ms. Nims approved Plaintiff for Paid Time Off from July 9-14, 2008, although as a new employee she was not yet eligible. (Pl.'s Resp. Ex. P; Pl.'s Resp. Ex. H, Gawthrop Dep. 42-44.)

Plaintiff described her work with the EAP as involving the identification of abuse of senior citizens in the community, whether sexual, physical, financial or verbal, and assessment of whether their situation warranted the involvement of the prosecuting attorney. (Defs.'s Mot. Ex. 1, Hawkins

Dep. 105-06.) Her job description, which bore the GHS title, listed her principal duties and responsibilities as conducting in-home assessments, communicating client needs to referral agencies, recording case activities, managing follow-up contacts, keeping accurate time records, consulting with team leaders, assisting with the development of assessment tools, participating in conferences and in-service programs and complying with all department policies and expectations.

**B. Plaintiff's Medical Conditions and Work Restrictions**

On Saturday, June 7, 2008, Plaintiff returned home after conducting two guardian ad litem interviews for CFG, and fell in the hallway of her home, this time fracturing her right femur. (Defs.'s Mot. Ex. 1, Hawkins Dep. 189-90; Pl.'s Resp. Ex. M, 13-14.) Plaintiff was hospitalized and underwent a surgical repair of the fracture. (Defs.'s Mot. Ex. 1, Hawkins Dep. 195; Pl.'s Resp. Ex. M (Medical Records).) Plaintiff never claimed that this injury was work related. Plaintiff's husband called Ms. Nims that day to inform Ms. Nims that Plaintiff had fallen but would still have the guardian ad litem reports prepared for Ms. Nims to take to probate court that following Monday. (Defs.'s Mot. Ex. 1, Hawkins Dep. 190.)

On Wednesday, June 11, 2008, Plaintiff returned to see her surgeon for her first post-operative visit and stopped in to see Ms. Nims after the appointment to give Ms. Nims the return to work slip she had received from the surgeon indicating that she could return to work as tolerated and to inform Ms. Nims that she would be returning to work on June 16, 2008. Plaintiff then left for the day. (Defs.'s Mot. Ex. 1, Hawkins Dep. 195-96, 209.) While at home in the interim, Plaintiff continued to do some work, reporting that she worked 5 hours on June 12, 2008. (Pl.'s Resp. Ex. Q.)

When Plaintiff reported for work on June 16, 2008, she was on crutches which she needed

at that time to get around. (Defs.'s Mot. Ex. 1, Hawkins Dep. 200.) She did drive herself to work that day and testified that while some co-workers helped her carry some bottled water, her computer and her purse into the office, she was fully capable of carrying a purse and other items while on crutches, and that she had done so in the past. (Defs.'s Mot. Ex. 1, Hawkins Dep. 200.) When Plaintiff arrived at the office, she started to put her things away and finish up some reports that were due the following week. (Defs.'s Mot. Ex. 1, Hawkins Dep. 201.)

About 10 minutes after Plaintiff arrived, Ms. Nims came in to her office and informed her that the return to work slip she had presented, which indicated she could return to work as tolerated, was inadequate and needed to be more specific. (Defs.'s Mot. Ex. 1, Hawkins Dep. 202, 209; Pl.'s Resp. Ex. S.) Plaintiff contacted her doctor and requested that he make the note more specific and fax it back to Plaintiff at the office. A revised return to work slip was faxed to the office that afternoon which stated that Plaintiff was not able to drive and was "only able to ambulate with aid of a walker and weight bear to tolerance." (Defs.'s Mot. Ex. 1, Hawkins Dep. 209-210; Defs.'s Mot. Ex 8.) Plaintiff testified that Ms. Nims reviewed the revised return to work slip and indicated that Plaintiff should not worry about it, that she could do other things in the office until her driving restriction was lifted. (Defs.'s Mot. Ex. 1, Hawkins Dep. 211.) Plaintiff testified that she returned to her office that day, completed several reports that were due in probate court and left at about 4:30, having worked approximately 7.5 hours that day. (Pl.'s Resp. Ex. A, Hawkins Dep. 204; Pl.'s Resp. Ex. D.)

The following morning, Tuesday, June 16, 2008 at 7:30 a.m., Ms. Nims phoned Plaintiff at home and told her not to report to work until her driving restriction was lifted, which was scheduled to occur on Friday, June 20, 2008. (Defs.'s Mot. Ex. 1, Hawkins Dep. 211-212, 219; Pl.'s Resp. Ex.

E.)  On Friday, June 20, 2008, Plaintiff reported to work with her final return to work slip which stated that Plaintiff was able to drive but needed to use a cane or crutches for assistance only. (Defs.'s Mot. Ex. 1, Hawkins Dep. 214; Pl.'s Resp. Ex. E.)  Plaintiff presented the note to Ms. Nims who informed Plaintiff that she could not stay at work because she could not do her job if she had to use crutches or a cane.  Plaintiff testified that Ms. Nims told her that if she "had to use any kind of assistive device, no matter what it was for, [she] couldn't do the job."  Plaintiff testified that she was "flabbergasted" by Ms. Nims response and never received a satisfactory response as to why Ms. Nims thought Plaintiff was unable to perform her job.  She left the office shortly thereafter. (Defs.'s Mot. Ex. 1, Hawkins Dep. 223-24.)

Ms. Nims testified that it was her opinion that Plaintiff "could not do her job on crutches" because of the "unstable environments we have to go into the homes, she could not be stable and safe on crutches."  (Defs.'s Mot. Ex. 3, Nims Dep. 50.)  When shown a list of Plaintiff's job description and asked to identify the responsibilities she felt Plaintiff couldn't perform, Ms. Nims responded:  "She couldn't conduct an in-home assessment and, therefore, couldn't communicate with the client and, therefore, she couldn't record case activity or manage or record or consult or assist or comply with the process.  All of them."  (Defs.'s Mot. Ex. 3, Nims Dep. 50.)

Plaintiff testified that at some point during her recovery, before she reported for work on June 16, 2008, she had placed an anonymous call to the human resources department to inquire about their policies for return to work.  She testified that Ms. Nims somehow found out about this call, which apparently had been traced to Plaintiff, and that Ms. Nims asked Plaintiff some questions on June 16th that indicated to Plaintiff that Ms. Nims had been talking to people in human resources who gave Ms. Nims information about Plaintiff's prior leg fracture that Ms. Nims otherwise never

would have known.  Ms. Nims told Plaintiff that her phone call had "opened up a can of worms" and Ms. Nims was very upset.  (Pl.'s Resp. Ex. A, Hawkins Dep. 212-213.)  Plaintiff testified that she did not understand Ms. Nims comment about opening up a can of worms but later learned what she thought was the meaning: "Barb told me that Diane had never reported that I had broken my leg and she knew it would cause problems, and I don't think Diane communicated with human resources until after I came back to work on the 16th."  Plaintiff testified that she was convinced that someone from human resources, she guessed that it might have been a Melissa Bentley, had given Ms. Nims information about Plaintiff's prior medical history, in particular about her prior worker's compensation claim made when she fractured her left leg, that somehow played a role in the decision to terminate her employment in June, 2008.  (Pl.'s Resp. Ex. A, Hawkins Dep. 232-33.)

Plaintiff testified, and medical records confirm, that she has suffered from rheumatoid arthritis since she was 2 years old.  (Pl.'s Resp. Ex. A, Hawkins Dep. 4-5; Ex. M.)  Plaintiff takes several medications for her arthritis, including several steroids, some of which cause her bones to become more brittle.  (Pl.'s Resp. Ex. A. Hawkins Dep. 6-7.)  Plaintiff testified that she sees a Dr. Diane Trudell, her prescribing physician for her rheumatoid arthritis medications, 2-3 times a year. (Defs.'s Mot. Ex. Ans. Interrog. 14, p. 11.).  Plaintiff's rheumatoid arthritis condition was well known to Ms. Nims, who in fact referred to Plaintiff's rheumatoid arthritis as her "disability."  When asked at her deposition whether she believed that the PWDCRA applied to Plaintiff, Ms. Nims replied that she did not: "Not in this incident.  This was an injury. Her disability was her chronic rheumatoid arthritis, but she was able to get around on that without crutches."  (Defs.'s Mot. Ex. 3, Nims Dep. 111.)  When Plaintiff was seen at the Genesys Regional Medical Center on October 2, 2007, when she fractured her left femur while leaving a client's home, the doctor noted evidence of

Plaintiff's multiple surgeries secondary to her history of rheumatoid arthritis. (Pl.'s Resp. Ex. M, p. 24.) Another doctor, who saw Plaintiff on June 19, 2008, in follow up to her second femoral fracture of her right leg, noted that Plaintiff had evidence of multiple previous surgeries for rheumatoid arthritis and related joint deformities and that Plaintiff demonstrated clinical evidence of spontaneous femoral fractures, stating that Plaintiff suggested in her history that the fractures felt as if they occurred before she fell. (Pl.'s Resp. Ex. M, p. 13-14.)

   C.     **Plaintiff's Termination**

   Plaintiff received a letter dated June 24, 2008, written by Melissa Wrobel, a human resource specialist for Genesys Regional Medical Center ("GRMC"), informing Plaintiff that the restriction contained in Plaintiff's June 20, 2008 return to work slip, which instructed that Plaintiff "must use crutches for mobility assistance only," could not be honored by her employer. (Pl.'s Resp. Ex. F, Deposition of Melissa Wrobel, July 20, 2009, p. 6; Defs.'s Mot. Ex. 16.) Ms. Wrobel's particular responsibility was processing leave of absence requests for all of the related Genesys entities. (Pl.'s Resp. Ex. F, Wrobel Dep. 7-8.) (*See infra* discussion of the Genesys entities at pp. 12-13.)

   Ms. Wrobel also testified on the subject of the company policy on FMLA leave, which she was authorized to process on behalf of all of the Genesys entities. Ms. Wrobel testified that she understood the policy to dictate that if she, or another manager of an employee, became aware that an employee's health condition would qualify them for FMLA leave, that either Ms. Wrobel or the manager was obligated to approach the employee about the possibility of taking FMLA leave. (Pl.'s Resp. Ex. F, Wrobel Dep. 13.) She testified that she considered whether Plaintiff was eligible for FMLA leave in this case and determined that Plaintiff was not eligible because she had been hired by CFG on January 1, 2008 and was still in the probationary period: "[W]hen determining if they

qualify for FMLA or not, I look at their date of hire to see if they have been employed by that facility for one year." (Pl.'s Resp. Ex. F, Wrobel Dep. 16-17, 18.) Ms. Wrobel testified that she did not consider any other information when concluding that Plaintiff was not eligible for FMLA leave. Ms. Wrobel did not know anything about Plaintiff's job restrictions and was not aware that Plaintiff had actually performed work for CFG for several years while employed by GHHH. (Pl.'s Resp. Ex. F, Wrobel Dep. 14, 17.) When asked if it would have made a difference to her determination that Plaintiff was ineligible for FMLA leave if she had known that Plaintiff had worked for CFG while employed by GHHH, Ms. Wrobel testified that it would not have changed her analysis because "each of the – Genesys Convalescent Center, Genesys Center for Gerontology, all of these companies that we named are separate companies." (Pl.'s Resp. Ex. F, Wrobel Dep. 18.)

On the same date that she wrote to Plaintiff to inform her that her work restrictions could not be honored, June 24, 2008, Ms. Wrobel sent an email to Amy Gawthrop, who was also employed by GRMC and worked as a labor relations advisor. (Pl.'s Resp., Ex. G, Deposition of Amy Gawthrop, July 20, 2009, p. 5; Ex. H.) The email indicated that the Subject was "Amy Hawkins - CFG" and instructed Ms. Gawthrop as follows: "Amy [Hawkins] is a probationary employee. She was injured at home on 06/07/08. The first missed day from work was 06/09/08. She has been given restrictions that can not be honored through 08/14/08. According to the non union GRMC contract a probationary employee off work more than 14 days they [sic] will be considered a voluntary quit. Can you please process."

On June 27, 2008, Ms. Gawthrop sent a letter to Plaintiff, as requested by Ms. Wrobel in her June 24, 2008 email, informing Plaintiff that because she had not worked since June 6, 2008, and had provided work restrictions which the company could not honor, she was being terminated from

employment pursuant to the following provision: "A leave of absence is an authorized absence from work without pay, and may be granted only to non-probationary full-time or part-time employees. A full-time or part-time probationary employee who is absent for more than fourteen (14) days is considered to have resigned." The letter further informed Plaintiff that, as a result of her probationary status, she was considered terminated effective June 6, 2008 and that her separation from employment had been processed. (Pl.'s Resp. Ex. R.) Ms. Gawthrop copied both Ms. Nims and Ms. Wrobel on her termination letter to Plaintiff. Ms. Gawthrop testified in her deposition that she had not done any independent investigation into Plaintiff's work restrictions, or why the company could not honor them, but relied entirely on the information received from Ms. Wrobel that the restrictions could not be honored. (Pl.'s Resp. Ex. H, Gawthrop Dep. 21-22.) Ms. Gawthrop also testified that she had discussions with Ms. Nims about whether or not in fact Plaintiff had worked on June 16, 2008 and that Ms. Nims had informed her that Plaintiff was not going to be paid for the work she performed on June 16, 2008. (Pl.'s Resp. Ex. H, Gawthrop Dep. 30.)

Ms. Gawthrop testified that she determined that Plaintiff was a probationary employee, and therefore subject to the 14 day voluntary quit rule, solely based upon Plaintiff's CFG hire date of January 1, 2008 and application of the 1250 hour probationary policy. (Pl.'s Resp. Ex. H, Gawthrop Dep. 36.) Ms. Gawthrop testified that she was not aware that Plaintiff had performed work for CFG during her tenure with GHHH, long before she officially became employed by CFG. (Pl.'s Resp. Ex. H, Gawthrop Dep. 36-37.) Ms. Gawthrop also testified that a probationary employee was not eligible to use paid time off (PTO) other than for holidays. (Pl.'s Resp. Ex. H, Gawthrop Dep. 42-44.)

### D.    Plaintiff's Discovery of Documents Falsely Bearing Her Signature

In February 2008, while doing some filing at CFG, Plaintiff noticed a geriatric assessment dated November 17, 2007, that indicated it had been completed by Plaintiff. This document caught Plaintiff's attention because she was off from work on that date, still recovering from her fractured femur, and could not have performed the assessment or signed the document, to which someone else had signed her name. (Defs.'s Mot. Ex. 1, Hawkins Dep. 112-13.) Plaintiff testified that in April, 2008, she found additional documents that she had not prepared or signed but which bore her signature. (Defs.'s Mot. Ex. 1, Hawkins Dep. 108-09.) Plaintiff testified that she brought this to Ms. Nims attention and that Ms. Nims did not offer an explanation but that someone, Plaintiff cannot remember exactly who, told Plaintiff that Ms. Nims assumed that Plaintiff would not mind if they signed her name to the assessment. (Defs.'s Mot. Ex. 1, Hawkins Dep. 110-114.) Plaintiff felt "uncomfortable" with the way Ms. Nims and others responded to her inquiry about the documents but did not indicate to anyone that she intended to report the incidents to anyone else. (Defs.'s Mot. Ex. 1, Hawkins Dep. 110-115.)

Plaintiff stated that she did not report the false signatures to anyone for fear of losing her job, and she testified in her deposition that she never thought that Ms. Nims or anyone else at CFG thought Plaintiff was planning to report the incidents. (Defs.'s Mot. Ex. 1, Hawkins Dep. 115.) This testimony contradicted Plaintiff's earlier answers to interrogatories in which she testified as follows: "When I noticed my name was on the documents without my knowledge I questioned Diane Nims and Barb Blackney. They stated at one point that "they knew I wouldn't mind." Other times they evaded the question or they did not answer. During these conversations, they became aware of my intent to report this information to the Genessee County Planning Commission which had supplied the grant in question." (Defs.'s Mot. Ex. 7, Answer to Interrog. No. 23, p. 16.) When

confronted with this inconsistency at her deposition, Plaintiff admitted that her testimony that day was different and offered the following explanation: "My assumption is that they knew at that point that I was concerned about them signing my name. They also knew that I was fully aware of who provided that grant money." (Defs.'s Mot. Ex. 1, Hawkins Dep. 141.) In fact, Plaintiff did not report the false documentation issue to anyone until after she was terminated by CFG. (Defs.'s Mot. Ex. 1, Hawkins Dep. 115.)

### E. The Relationship Among the Genesys Entities

In addition to GHHH and CFG, Plaintiff has also filed suit against Genesys Health System ("GHS"), Genesys Ambulatory Health Services, Inc. ("GAHS"), and Ascension Health ("Ascension"). Each of these Defendants, except for Ascension, have the same registered agent and have the same registered office. (Pl.'s Resp. Ex. X, Resp. to Req. Admit, Nos. 1, 2.) All of these entities are consolidated under one common Human Resources department, which is the department responsible for processing benefits, leaves of absence (including FMLA leave) and employee terminations. (Pl.'s Resp. Ex. G, Gawthrop Dep. 5-7; Ex. F., Wrobel Dep. 7-9, 11-13.) Decisions made by employees in Human Resources are made independently and HR employees are not required to consult anyone else before making such decisions. (Pl.'s Resp. Ex. F, Wrobel Dep. 11.)

The GHS, comprised of all these entities, marketed itself as a "continuum of care service" that could provide medical services to patients from birth until death. (Pl.'s Resp. Ex. F, Wrobel Dep. 16; Ex. G, Gawthrop Dep. 15.) At the time of Plaintiff's termination, the CFG reported to Rob Stevens, the Vice President of continuum of care services. (Pl.'s Resp. Ex. G, Gawthrop Dep. 15.) Employees who move between these entities do not always have to go through a probationary period as Plaintiff did in this case. Sometimes such changes are accomplished by a simple

reclassification. (Pl.'s Resp. Ex. F. Wrobel Dep. 9.) Even when employees who move between entities are technically considered in a probationary period, they are not consistently treated as such, as evidenced by Plaintiff's PTO authorization which she obtained just two months after her transfer to CFG. (Pl.'s Resp. Ex. P.)

Many of the documents and communications that Plaintiff received in connection with her employment, and specifically with her claims in this case, bore the "Genesys Health System" logo, including the Job Description posting for the CFG position Plaintiff accepted, the form used by Plaintiff to request PTO, Plaintiff's Application for the position with CFG, her Acceptance of Employment, the January 24, 2008 letter informing Plaintiff that her work restrictions could not be honored and the January 27, 2008 termination letter, which quoted from the Genesys Health System handbook as a basis for her dismissal. (Pl.'s Resp. Ex. O, P, C, U, V, R; Pl.'s Resp. Ex B, Nims Dep. 105-06; Ex. F, Wrobel Dep. 36-37; Ex. G, Gawthrop Dep. 32-37, 42, 52.) CFG had its own Personnel Policies and Practices Handbook, which indicated on its cover that CFG was an affiliate of the GHS. (Defs.'s Reply, Ex. D.) However, the Genesys Health System Employee Handbook for Non-Bargaining Unit Employees applied to Plaintiff and was used where the CFG policy was silent, as it was on the subject of Plaintiff's qualification for leave and standards for voluntary quit. (Pl.'s Resp. Ex. F, Wrobel Dep. 21, 23; Ex. C, Gawthrop Dep. 35.)

When Plaintiff moved to CFG from GHHH, her orientation was conducted by a Genesys Health System employee and she received an Ascension Health handbook. (Pl.'s Resp. Ex. A, Hawkins Dep. 150-52.) Several GHS facilities were located in the same building including the GHHH and CFG. (Pl.'s Resp. Ex. B, Nims Dep. 63.)

Plaintiff's Acceptance of Employment was presented on GHS letterhead, and Plaintiff was

further required to execute an acknowledgment that she was associated with the Ascension Health Ministry and would comply with Ascension's Standards of Conduct and Corporate Responsibility Program "as a condition of [her] continued employment or association with Ascension Health." (Pl.'s Resp. Ex. U.)  Thus, Ascension Health was the "higher authority" to which all answered.

CFG, GHHH and GHS were separate legal entities and for daily operations CFG and GHHH both held their own individual bank accounts.  (Defs.'s Reply, Ex. E, Palazzolo Aff. ¶ 2.)  CFG and GHHH operated under their own separate individual financial statements and staff for both generally worked in a different suite of offices.  (*Id*.)  Management for CFG and GHHH had no authority to discipline or terminate each other employees and had separate boards of trustees. (*Id*.)  None of the board members of GHS serve on either the CFG or the GHHH boards.  (*Id*.).

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted.  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id*. (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Term. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be

enough to raise a right to relief above the speculative level...." *Id*. at 555 (internal citations omitted).

The Supreme Court recently clarified, in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), that:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Id*. at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969). In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive

document upon which it relied." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir.1997).

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## III. ANALYSIS

### A. Plaintiff's State Claim Under PWDCRA

#### 1. The basic principles of the PWDCRA in the employment context.

The PWDCRA guarantees to all persons the right to be free from discrimination on the basis of a disability, as that term is defined in the act. Defining its primary objective, the PWDCRA provides in pertinent part**:** "(1) The opportunity to obtain employment . . . without discrimination because of a disability is guaranteed by this act and is a civil right. (2) [A] person shall accommodate a person with a disability for purposes of employment . . . unless the person demonstrates that the accommodation would impose an undue hardship." MCL 37.1102. The PWDCRA further provides that an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position." MCL

37.1202(1)(b).

It is not considered discrimination under the PWDCRA to refuse to accommodate an employee whose disability is directly related to the employee's ability to perform the duties of her job. *See Carr v. General Motors Corp.*, 425 Mich. 313, 323, 389 N.W.2d 686 (1986) (holding that an employee whose disability is related to his ability to perform the duties of his position is not disabled under the act and therefore an employer has no duty to accommodate). Noting that many types of accommodation required by the act are unrelated to ability to perform, such as wheelchair ramps, wide doorways or hallways, raised numbers for the blind, adopting alternative testing measures for disabled individuals, reassigning parking or office locations, the court in *Carr* refused to adopt the court of appeals' reasoning that the act is meaningless without accommodation related to disability: "The Legislature has spoken clearly and has mandated, not just once but many times throughout the HCRA [predecessor act to the PWDCRA] that the only handicaps covered by the act, for purposes of employment, are those unrelated to ability to perform the duties of the position." 425 Mich. at 321-22. Thus, a "successful claim under the [PWDCRA] requires a finding that plaintiff is physically limited in a way unrelated to his ability to work." *Kerns v. Dura Mechanical Components, Inc.*, 242 Mich. App. 1, 17, 618 N.W.2d 56 (2000).

Where an employee claims that he was not actually disabled but was perceived as being disabled by his employer, an employer has no duty to provide an accommodation. *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999) ("Under the third prong, 'regarded as' having a disability, the defendant correctly contends that a finding on this basis would obviate the Company's obligation to reasonably accommodate Workman."). *See also Baker v. Windsor Republic Doors*, No. 1:06-cv-01137, 2009 WL 1231035 at * 9 (W.D. Tenn. May 1, 2009) (unpublished) (holding that

the Sixth Circuit's clear statement in *Workman* that a finding of "regarded as" disability obviates the obligation to reasonably accommodate is binding precedent and upholding jury's finding that defendant was not liable for failing to accommodate a "regarded as" disabled employee).[1]

Where an employee is unable to demonstrate that she can perform the essential functions of her job, and therefore cannot demonstrate disability under the act, the employer is not obligated to allow the employee a "reasonable time to heal." *Lamoria v. Health Care & Retirement Corp.*, 233 Mich. App. 560, 562, 593 N.W.2d 699 (1999) (rejecting its earlier holding in *Rymar* that an employee who, on the date of discharge, is unable to perform the requirements of his job because of a disability must be given a reasonable time to heal and holding that an employer is not required to allow a disabled employee a reasonable time to heal). *See also Kerns, supra* 242 Mich. App. at 16 ("an employer's duty to make a 'reasonable accommodation' under the HCRA does not extend to granting the plaintiff a medical leave until such time as he would be able to perform the requirements of his job.").

### 2. Establishing a *prima facie* case under the PWDCRA

A plaintiff claiming discrimination under the PWDCRA establishes a prima facie case by demonstrating that "(1) he is 'disabled' as defined by the statute, (2) the disability is unrelated to the plaintiff's ability to perform the duties of a particular job, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute." *Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 473, 606 N.W.2d 398 (1999).

The PWDCRA defines disability, in pertinent part, as follows:

---

[1] Although Plaintiff correctly points out that other circuits disagree with the *Workman* holding, *see* cases collected in *Baker, supra* at * 10 n. 18, this Court is bound by the Sixth Circuit's holding in *Workman.*

d) Except as provided under subdivision (f), "disability" means 1 or more of the following:

(I) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:

(A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

*       *       *

(iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (I).

MCL 37.1103(d).

Plaintiff in the instant case appears to claim not that she is disabled, in fact she strenuously argues that she is not disabled, but that Defendants perceived her as disabled. In Plaintiff's response to Defendants' motion to dismiss, she reiterates that she is proceeding under (iii): "In the case at bar, it is clear that the Plaintiff satisfied subsection (iii) of the definition of the term "disability." (Pl.'s Resp. 7.) Thus, the Court will analyze the claim as a "regarded as" claim under the PWDCRA.

In *Michalski v. Bar-Levav, M.D.*, 463 Mich. 723, 625 N.W.2d 754 (2001), the court set forth the analysis for determining whether a plaintiff has been regarded as disabled:

> While a plaintiff need not actually have a determinable physical or mental characteristic, to qualify as handicapped under subsection (iii), the plain statutory language does require that the plaintiff prove the following elements: (1) the plaintiff was regarded as having a determinable physical or mental characteristic; (2) the perceived characteristic was regarded as substantially limiting one or more of the plaintiff's major life activities; and (3) the perceived characteristic was regarded as being unrelated to the plaintiff's ability to perform the duties of a particular job or position or to the plaintiff's qualifications for employment or promotion.

463 Mich. at 759-760.

Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Chiles, supra* at 477 (internal citation and quotation marks omitted). "Thus, any 'substantial limitation' suffered by an allegedly disabled individual must [be perceived to] relate to one of these activities." *Id.* The "substantial limitation" prong of the test has been said to be the most significant factor in limiting the applicability of the PWDCRA to its intended beneficiaries. *Id.* "It is not enough for an impairment to [be perceived to] affect a major life activity, but rather the plaintiff must proffer evidence from which a reasonable inference can be drawn that such activity is [perceived to be] substantially limited." *Id.* at 479 (internal citation and quotation marks omitted). In determining whether or not a listed impairment is "substantial" the Court should consider: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or expected permanent or long-term effect. 238 Mich. App. at 479.

Additionally, the alleged disability must be evaluated as it existed at the time of employment:

> Depending on whether a plaintiff is proceeding under the "actual" or "regarded as" portions of the statute, because of the Legislature's choice of the present tense language in defining the term handicap, we must evaluate the physical or mental characteristic at issue either (1) as it actually existed at the time of the plaintiff's employment, or (2) as it was perceived at the time of the plaintiff's employment.

463 Mich. at 733. "Thus, to qualify for coverage under subsection (iii), plaintiff must be regarded as having a characteristic that currently creates a substantial limitation of a major life activity." *Id.*

To sustain her "regarded as" claim, Plaintiff must produce evidence that her employer perceived her as actually disabled under the act.[2] "[S]howing that an employer thought that a

---

[2] The Code of Federal Regulations (interpreting the companion ADA) gives some guidance on how a plaintiff can establish the "regarded as" theory. To sustain her "regarded as" theory, Plaintiff must produce evidence: (1) that she has a physical impairment that does not substantially limit major life

plaintiff was somehow impaired is not enough; rather a plaintiff must adduce evidence that a defendant regarded the plaintiff as having an impairment that substantially limited a major life activity - just as with an actual disability." *Chiles, supra* 238 Mich. App. at 475.

### 3.     The nature of Plaintiff's claim

The exact contours of Plaintiff's claim under the PWDCRA are not well defined, as she often conflates, intentionally or not, the allegations regarding her employer's perception of the physical impairment caused by her broken leg and the perception of the physical manifestations of her rheumatoid arthritis.  It appears quite clear, as Defendants argue, that if Plaintiff is alleging that Defendants regarded her as disabled because of her broken leg, this does not suffice to state a claim under the PWDCRA as a disability normally does not include temporary medical conditions, even if those conditions require extended leaves from work.  The court in *Chiles, supra*, noted that 'intermittent, episodic impairments are not disabilities, the standard example being a broken leg." *Chiles, supra* 238 Mich. App. at 479-480.  "[A] temporary limitation cause by a commonplace injury, such as a back injury, would not constitute a substantial limitation on any major life activity."  238 Mich. App. at 482.  The court explained at length as follows:

> Applying the protections of the ADA to temporary impairments, such as the one presented here, would work a significant expansion of the Act.  The ADA simply was not designed to protect the public from all adverse effects of ill-health and misfortune.  Rather, the ADA was designed to assure [ ] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps.  Extending the statutory protections available under the ADA to individuals with broken bones,

---

activities but was viewed by her employer as being so limiting; or (2) that she has a physical impairment that substantially limits major life activities only because of people's attitudes about the impairment; or (3) that she has none of the impairments identified in (1) or (2) but was treated by her employer as having such a substantially limiting impairment.  29 C.F.R. § 1630.2(1)-(3) (defining "regarded as").

sprained joints, sore muscles, infectious diseases, or other ailments that temporarily limit an individual's ability to work would trivialize this lofty objective.

238 Mich. App. at 480-481 (internal citations and quotation marks omitted). Concluding that plaintiff did not suffer from such a permanent disability, the court held:

The larger the class of "protected individuals," the less significant the PWDCRA can be in "equaling the playing field" for those individuals suffering from the most severe and genuinely intractable disabilities. Although we do not adopt any bright-line rule for determining the exact length of time required for "substantial duration" and do not purport to define what types of impairments would qualify as "commonplace," we nonetheless conclude that the term "disability" embodied in the PWDCRA connotes some sense of permanency. Therefore, where an impairment is temporary and relatively easily remedied, when considered in the greater scheme of potential impairments, such as with a temporary back injury, such an ailment is not a substantial limitation on any major life activity

238 Mich. App. at 481-482.

However, while Plaintiff's broken leg, viewed in isolation, clearly would not constitute such a disability, Plaintiff proceeds on a different theory. (Pl.'s Resp. 8-11.) Plaintiff's "regarded as" theory appears to be that she has a physical impairment that does not substantially affect a major life activity but which is perceived by her employer as constituting such a limitation. Plaintiff identifies the physical impairment (as perceived by her employer) as her rheumatoid arthritis which manifests itself through spontaneous fractures. She claims that her employer perceived that this impairment affected the major life activity of walking and carrying. She claims that the limitation is perceived by her employer to be substantial because, although the broken bones heal, rheumatoid arthritis is a permanent condition and Plaintiff could present with further manifestations at any time. Finally, Plaintiff claims that her perceived disability is unrelated to her ability to perform her job duties because she could perform all of the duties of her job if allowed to walk with a cane or crutch. Thus, Plaintiff implies that her employer perceived her rheumatoid arthritis, which predisposed Plaintiff

23

to spontaneous fractures, to be a disability which substantially affected the major life activities of walking and carrying when Plaintiff would succumb to a fracture. Thus, while each episodic event of spontaneous fracture would seem to be the transitory type of injury not contemplated by the act, when viewed not in isolation but as part of Plaintiff's larger rheumatoid arthritic condition, these breaks indeed could be viewed as a disability. The court in *Chiles, supra* hinted that just such a scenario might be distinguishable:

> We are aware that plaintiff suffered several back injuries during his employment with defendant, beginning in the 1980's. The first back injury required surgery, after which plaintiff returned to work until the 1991 injury currently at issue. The record shows that these injuries were two separate incidents and there is no evidence that they were part of a larger disability or syndrome or related in any fashion.

238 Mich. App. at 483 n. 7.

Plaintiff has offered substantial evidence in support of her claim that the prescription drug treatment that has been necessitated by her life-long battle with rheumatoid arthritis has caused her bones to be more brittle and to be prone to spontaneous fractures, such as the two recent fractures of her femurs, where it felt to her like her hips broke before she fell. She also has offered evidence that her employer was aware of this history and Ms. Nims, in particular, specifically identified Plaintiff's "disability" as her rheumatoid arthritis, not her broken leg. Further, when the human resources employee who knew the medical details of Plaintiff's first hip fracture (presumably this HR person knew about Plaintiff's rheumatoid arthritis and her potential for other episodes of spontaneous fracture) found out about Plaintiff's second fracture, it "opened a whole can of worms." Plaintiff testified that her employer now viewed her as a "liability" due to her underlying condition.

Plaintiff's theory, however, faces some obstacles. In *Michalski, supra*, the court analyzed plaintiff's claim that her employer perceived her as handicapped due to her diagnosis of multiple

sclerosis, which, although in its dormant stage, had a poor prognosis for future disabling symptoms. Concluding that plaintiff did not have a characteristic that "currently create[d] a substantial limitation on a major life activity," the court held:

> [Plaintiff] presented no evidence that Dr. Bar Levav regarded her as unable to perform basic tasks of ordinary life. Indeed, from all indications, she was physically capable of performing her job duties. At most, plaintiff presented evidence that she informed the defendant that she had been tentatively diagnosed with multiple sclerosis and that he believed that this might substantially limit her major life activities in the future. Thus, the trial court properly granted summary disposition on plaintiff's claim that she was regarded as handicapped under the HCRA.

463 Mich. at 733-34. Plaintiff's theory rests in part on the notion that her employer perceived her as a "liability" going forward, implying that her employer feared future episodes of spontaneous fractures. Such a theory would seem to be barred by the teaching of *Michalski* that a perceptual discrimination claim must be based on an impression that the individual is presently disabled. However in the instant matter, at the time of the adverse employment decision, Plaintiff in fact was presently being perceived by her employer as suffering a substantial limitation on the major life activity of walking and carrying as a result of her femur fracture which was precipitated by her rheumatoid arthritis. Thus, unlike the plaintiff in *Michalski* whose multiple sclerosis was dormant at the time of the adverse employment decision, Plaintiff in the instant case was actually in a "symptomatic" stage at the time of the termination. Justice Kelly, dissenting in *Michalski*, criticizing the majority's "present tense" test as virtually foreclosing a "regarded as" claim, hypothesized the necessary claim under such a strict reading: "Under the majority's 'present tense' test, [plaintiff] would have to show that (1) she actually exhibited symptoms of MS, (2) her employer perceived them as limiting her life activities, and (3) acted on that perception by taking adverse action against her." 463 Mich. at 763. This is precisely what Plaintiff in the present case

attempts to show. Viewing the facts in the light most favorable to Plaintiff, she has sketched the outlines of such a claim.

However, Plaintiff's theory still faces the challenge that the physical manifestation, i.e. the fracture, is transitory in nature and, viewed in isolation, would fail to qualify as a perceived disability under *Chiles*. But the court in *Chiles* commented in footnote 7 that the plaintiff had not produced any evidence that his back injuries were part of a larger syndrome, and thus left the door open for the type of claim that Plaintiff makes here. This Court focuses not on the symptom which causes a temporary physical limitation but on the underlying condition which holds the continuous threat of such recurring physical limitations.

To state her claim under the PWDCRA, Plaintiff still must establish that the disability was perceived by her employer as unrelated to her ability to perform the duties of her job. If the disability is viewed as Plaintiff's broken leg, it appears that Ms. Nims perceived this as related to her ability to do her job. Ms. Nims testified that Plaintiff's need to use a cane or crutch disqualified her from being able to perform the responsibilities of her position.[3] However, if the perceived disability is rheumatoid arthritis, Ms. Nims expressly testified that Plaintiff's rheumatoid arthritis did not interfere with her ability to do her job and that in fact Plaintiff had performed admirably over the years in spite of her severe rheumatoid arthritis and related pain.

### 4. Plaintiff has presented sufficient evidence of pretext

The Court finds that Plaintiff has established a *prima facie* case of discrimination under the

---

[3]Because Plaintiff proceeds under a "regarded as" theory, her employer has no duty to accommodate her disability if it relates to her ability to perform the responsibilities of her job. *Workman, supra,* 165 F.3d at 467. If Plaintiff were to proceed under a "disabled" theory (she does plead both in her Complaint although she appears to be proceeding on the "regarded as" theory) the issue of reasonable accommodation would become significant.

PWDCRA, and the burden now shifts to Defendants, to articulate a legitimate, non-discriminatory reason for termination. *Rollert v. Dep't. of Civil Service*, 228 Mich. App. 534, 538, 579 N.W.2d 118 (1998). Once Defendants present such evidence, the burden returns to Plaintiff to show that the reason offered by Defendants was only a pretext for discrimination. *Id.* To establish pretext, a plaintiff must show that: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the action; or (3) the proffered reason [was] insufficient to motivate the action. *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 589 (6th Cir. 2002). "When a plaintiff proves that the defendant's proffered reasons either have no basis in fact or are insufficient to motivate a discharge, a permissive inference of discrimination arises." *Id.* (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 346 (6th Cir. 1997)).

Defendants state that they terminated Plaintiff on June 27, 2008, because she allegedly missed 14 consecutive days of work during her probationary period and that this was considered a voluntary quit under the company's policies. (Pl.'s Resp. Ex. R.) But there is significant factual disagreement about whether Plaintiff did miss 14 consecutive days because she maintains that she worked on June 16, 2008 and provides documentation to support this. Although Ms. Nims informed Ms. Gawthrop, who issued Plaintiff's termination letter, that Plaintiff was not to be paid for the work that she did when she came to the office on June 16, 2008 for 7.5 hours, this does not determine the issue of whether or not in fact Plaintiff worked that day. Plaintiff testified that she prepared reports on June 16, 2008 while at the office that were filed in probate court the following week. Both Ms. Nims, Plaintiff's immediate supervisor, and Ms. Gawthrop, who actually terminated Plaintiff, knew that there was a question as to whether Plaintiff actually worked on June 16, 2008 yet they proceeded with her termination. Thus, there is a genuine issue of fact as to whether the proffered

reason – missing 14 consecutive days of work – had any basis in fact. Moreover, Plaintiff attempted to return to work on June 20, 2008, as Ms. Nims had encouraged her to do, and was told that she could not return to work if she needed to use her cane or crutch. Plaintiff makes a good point when she argues that it is disingenuous for Defendant to prevent Plaintiff from returning to work and then argue that she failed to report. (Pl.'s Resp. 16.) Plaintiff has presented sufficient evidence to preclude summary judgment on the issue of pretext, and the Court finds there are genuine issues of material fact as to Plaintiff's claims under the PWDCRA.

### B. Plaintiff's Federal Claim Under FMLA

Plaintiff claims in Count II of her Complaint that her "actions sufficiently placed Defendants on notice that, if they would not permit her to return to work, she should have been placed on medical leave pursuant to the FMLA." (Compl. ¶ 30.) FMLA provides 12 weeks of unpaid leave to an employee who has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(2)(D). Employers are prohibited by the act from interfering with an employee's right to take such leave. 29 U.S.C. § 2615. To sustain a FMLA interference claim, Plaintiff must demonstrate that: (1) she was an eligible employee, (2) Defendants are employers as defined under the Act, (3) she was entitled to leave under FMLA, (4) she gave the employer notice of intention to take foreseeable leave and (5) the employer denied her FMLA benefits to which she was entitled. *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). To qualify for FMLA leave, Plaintiff must have been employed "for at least twelve months by the employer with respect to whom leave is requested, and who has been employed by that employer for at least 1,250 hours of service during the twelve-month period immediately preceding the commencement of the leave." *Davis v. Michigan Bell Telephone Co.*,

543 F.3d 345, 347 (6th Cir. 2008) citing 29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110(a)(2).

Defendants do not contest Plaintiff's allegation that they received sufficient notice from Plaintiff to trigger their obligations under FMLA to offer Plaintiff FMLA leave. Indeed, in her deposition Ms. Wrobel testified that she did consider Plaintiff's qualification for FMLA leave. Ms. Wrobel testified that she understood that if she, or another manager of an employee, became aware that an employee's health condition would qualify them for FMLA leave, that either Ms. Wrobel or the manager was obligated to approach the employee about the possibility of taking FMLA leave. (Pl.'s Resp. Ex. F, Wrobel Dep. 13.) She testified that she considered whether Plaintiff was eligible for FMLA leave in this case and determined that Plaintiff was not eligible because she had been hired by CFG on January 1, 2008 and was still in the probationary period: "[W]hen determining if they qualify for FMLA or not, I look at their date of hire to see if they have been employed by that facility for one year." (Pl.'s Resp. Ex. F, Wrobel Dep. 16-17, 18.) Defendants contend that Plaintiff, who resigned from GHHH on December 31, 2007 and started her new job with CFG, a new employer, on January 3, 2008, was not eligible for FMLA leave because she was not employed by CFG for at least 12 months, or 1,250 hours, as required under FMLA.

Plaintiff responds that her FMLA claim should be analyzed under the "integrated employer" test which would require the Court to consider each of the entities named as Defendants in this case a single employer and to conclude Plaintiff's employment by the "enterprise" since 1996 qualifies her for FMLA leave. To determine whether the Defendant-entities constitute an "integrated enterprise," the Court considers: (1) whether there is interrelation of operations; (2) whether there is common ownership; (3) whether there is centralized control of labor relations and personnel; and (4) whether there is common management, common directors and boards. *Grace v. USCAR*, 521

F.3d 655, 664 (6th Cir. 2008). Plaintiff points to the facts that: (1) there is centralized control of labor relations and personnel in that: (a) each of the entities operates under a consolidated human resources department, which is responsible for processing benefits, leaves of absence and employee terminations; (b) the HR department makes independent human resource decisions and the entities share, to at least some degree, the same employee handbook; (c) Plaintiff's orientation was conducted by a GHS employee; and (d) Plaintiff's termination letter quoted from the GHS handbook as the basis for her dismissal; (2) there is interrelation of operations in that (a) all of the entities except Ascension have the same resident agent and the same registered office; (b) at the time of Plaintiff's termination, her employer, CFG, reported to Rob Stevens, the Vice President of the continuum of services program, which encompassed all of the entities; (c) some employees, such as Ms. Wrobel, did move between entities without being considered "new hires" at the new entity and without having to go through a probationary period as Plaintiff did in this case and Plaintiff in this case was granted PTO leave while in her "probationary" period; and (d) Plaintiff herself worked for years, while employed by GHHH, for CFG, thus indicating that the entities shared employees; (3) there was an implication of common ownership in that all of the communications received by Plaintiff in connection with her claims in this case, from her Acceptance of Employment to her Letter of Termination, all bore the GHS logo and implied and stated that the entities were "affiliates," implying common ownership. And, of course, there is the Ascension imprimatur that appears on multiple forms, and further on its own, requires Plaintiff to ascribe to and accept the Ascension Health Ministry. In connection with her Acceptance of Employment, Plaintiff was required to read and acknowledge the following statement:

> As an associate or agent employed by or associated with an Ascension Health Health [sic] Ministry, I am committed to upholding the highest standard of individual ethical

and legal business practices. I will not tolerate illegal or questionable activity and promise to take whatever steps are required b the [Ascension Health] Corporate Responsibility Program to identify, report and prevent such activity.

I acknowledge that I have received my personal copy of the [Ascension Health] Standards of Conduct and agree to follow them. I understand that compliance with the Standards of Conduct and the Corporate Responsibility Program is a condition of my continued employment or association with Ascension Health.

(Pl.'s Resp. Ex. U.)

Defendants counter, focusing primarily on the relationship between GHHH and CFG, that: (1) there is an absence of interrelation of operations in that CFG, GHHH and GHS are separate legal entities and that for daily operations CFG and GHHH have separate bank accounts, operate under separate financial statements and generally have separate staff who work in a different suite of offices; (2) the management for CFG and GHHH have no authority to hire or fire or discipline employees of the other entity and therefore are not fully centralized as to labor relations; (3) that CFG and GHHH have no common board members or trustees and that none of the board members of GHS serve on either the CFG or GHHH boards.

Although none of the four factors is conclusive, centralized control of labor relations is an important factor in the single employer test and Plaintiff need not demonstrate that each of the four factors has been met. *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 994 (6th Cir. 1997); *Almeida v. Athena Health Care Assoc., Inc.*, No. 07-cv-517, 2009 WL 490066 at * 6 (D. Conn. Feb. 26, 2009) (unpublished) (collecting cases stressing the importance of the centralized control of labor relations). Although Defendants provide an affidavit stating that management of CFG and GHHH had no authority to terminate or discipline each other's employees, the affidavit does not speak to the centralized control of the consolidated human resources department over all of the Genesys entities. Plaintiff has presented evidence that, although CFG may have executed the

decision to terminate Plaintiff, it did so in reliance on GHS and Ascension corporate policy. Viewing the facts provided in the light most favorable to the Plaintiff, Plaintiff has presented enough evidence to survive summary judgment on her integrated enterprise claim. Plaintiff has presented sufficient evidence to preclude summary judgment on her claim that she has been employed by the Genesys enterprise since 1996 and qualified for FMLA leave. The Court does not express an opinion on the other elements of a FMLA claim as neither party addressed them in their briefs.

### C.    Plaintiff's Whistleblower and Worker's Compensation Retaliation Claims

Plaintiff's counsel conceded at the hearing on this matter on March 11, 2010 that her client has abandoned her Whistleblower and Worker's Compensation Retaliation claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion to Dismiss and/or for Summary Judgment as to Count I (PWDCRA) and Count II (FMLA) and GRANTS Defendants' Motion to Dismiss and/or for Summary Judgment as Count III (Whistleblower) and Count IV (Worker's Compensation Retaliation). (Dkt. No. 25).

IT IS SO ORDERED.


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 24, 2010

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 24, 2010.


S/Denise Goodine
Case Manager